UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| Plaintiff, | § | |
| v. | § | CIVIL NO. |
| | § | |
| $27,349.00 in U.S. Currency, | § | |
| | § | |
| Assorted Jewelry Valued at $22,975.00, | § | |
| | § | |
| Net Proceeds from the Sale of Real | § | |
| Property Located at 30825 Washington | § | |
| Road, Calhan, Colorado 80808, | § | |
| | § | |
| Real Property Located at 5821 NW 127th | § | |
| Street, Oklahoma City, Oklahoma, 73142, & | § | |
| | § | |
| Real Property Located at 890421 S. 3480 | § | |
| Road, Chandler, Oklahoma, 74834, | § | |
| | § | |
| Defendants. | § | |

## VERIFIED COMPLAINT FOR CIVIL FORFEITURE
## IN REM AND NOTICE TO POTENTIAL CLAIMANTS

Now comes Plaintiff, the United States of America, and files this action for forfeiture *in rem* against the above-entitled Defendant Properties. The United States respectfully alleges on information and belief as follows:

### JURISDICTION AND VENUE

1.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1345 and 1355.  The Defendant Properties are located in the Southern District of Texas or are forfeitable due to acts and omissions occurring within the Southern District of Texas and are therefore within the jurisdiction of this Court.

2.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1355, 1391(b) and 1395(a) and (b).

## THE DEFENDANT PROPERTIES SUBJECT TO FORFEITURE

3.      The Defendant Properties are described as follows:

      a.      $27,349.00 in U.S. currency;

      b.      Assorted jewelry valued at approximately $22,975.00;

      c.      Net proceeds from the sale of real property located at 30825 Washington Road, Calhan, Colorado, 80808;

      d.      Real property located at 5821 NW 127th Street, Oklahoma City, Oklahoma 73142;

      e.      Real property located at 890421 S. 3480 Road, Chandler, Oklahoma, 74834;

(collectively, the "Defendant Properties").

## STATUTORY BASIS FOR FORFEITURE

4.      The Defendant Properties are subject to forfeiture under 21 U.S.C. §§ 853(a) and 881(a)(6), which provides for the forfeiture of all monies furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of the Controlled Substances Act (21 U.S.C. § 801, *et seq.*), all proceeds traceable to such an exchange, and all moneys used or intended to be used to facilitate any violation of the Controlled Substances Act.

5.      This action is also brought pursuant to 18 U.S.C. §981(a)(1)(B)(i), which provides for the forfeiture of  "any property, real or personal, within the jurisdiction of the United States, constituting, derived from, or traceable to, any proceeds obtained directly or indirectly…or any property used to facilitate such an offense…(which) involves the manufacture, importation, sale or distribution of a controlled substance (as that term is defined for purposes of the Controlled Substances Act), or any other conduct described in section 1956(c)(7)(B)."

6.      This action is also brought pursuant to 21 U.S.C. § 841(a)(1), which makes it unlawful for any person to knowingly and intentionally distribute or dispense a controlled

substance except as authorized by law. 21 U.S.C. § 846 prohibits an agreement between two or more persons to unlawfully distribute or dispense controlled substances.

7.      This action is also brought pursuant to 18 U.S.C. § 981(a)(1)(A), which provides for the forfeiture of property involved in a violation of 18 U.S.C. § 1957. Section 1957 makes it unlawful to engage in monetary transactions of greater than $10,000 using proceeds derived from specified unlawful activity.

**SUMMARY OF THE INVESTIGATION**

8.      Drug Enforcement Administration (DEA) Houston Division Office Tactical Diversion Squad and the Houston Police Department uncovered an illegal pill mill operation operated by Keilan Peterson. With funds acquired from this illegal pill mill operation, Peterson is responsible for putting illegal prescription drugs on the streets and using the profits from the illegal operation to acquire the Defendant Properties and other assets.

**FACTS OF THE CASE**

9.      On October 18, 2023, Drug Enforcement Administration (DEA) Houston Division Office Tactical Diversion Squad, with the assistance of Houston Police Department, executed a federal search warrant at Keilan Peterson's primary residence at 3926 Childress Street, Houston, Texas, 77005, and Relief Medical Center, 3208 Broadway, Houston, Texas, 77017. On the same date, a federal search warrant was executed at Next Level Pharmacy, 1110 Texas Parkway, Suite 200, Stafford, Texas, 77477.

10.     Investigators seized $27,349 in U.S. currency from Relief Medical Center and jewelry valued at $22,975 from Peterson's residence at 3926 Childress Street, Houston, Texas 77005 (two of the Defendant properties). Investigators also seized electronic equipment, prescription bottles, business and banking documents, and patient files.

11.     According to the Texas Secretary of State's Office (hereafter SOS), the entity "Relief Care Group LLC," which was formed on August 25, 2018, indicated there were two assumed names under which the business or professional service is or is to be conducted or rendered; these two names are "Relief Medical Center (Relief)" and "Broadway Medical Center." Further, the SOS Assumed Name Certificate was signed by Peterson, indicating that Peterson was the officer, general partner, manager, representative, or attorney-in-fact of the entity. (For ease of reference, this entity is referred to as "Relief" throughout this complaint.)

12.     The investigation determined that Relief was operating as an illegal pain management clinic, also known as a "pill mill." Relief has issued numerous illegal prescriptions for hydrocodone, oxycodone and Carisoprodol which were illegally diverted to street level drug sales.

13.     A pill mill typically works as follows: crew leaders pay individuals, some of whom are homeless or impoverished, to pose as chronic pain patients in exchange for a small fee or pills. The crew leaders drive those people, often in groups, to a clinic, where the crew leaders supply cash to cover each patient visit. Crew leaders frequently coach the patients to fill out patient intake documentation to support a prescription for pain medication, for example, by stating that the patient suffers from lower back pain with muscle spasms. The clinic owners/operators and the physicians often know that the information on the patient documentation is false or exaggerated and is designed to support the controlled substance prescriptions on paper.

14.     The actual doctor visit, if there is one, usually includes only a perfunctory consultation. At the conclusion of the visit, the physician or an individual illegally acting on behalf of the physician almost always orders at least one controlled substance prescription—for a

Schedule II opioid controlled substance such as oxycodone or hydrocodone, and at times a second controlled substance prescription for Schedule IV carisoprodol. These prescriptions are issued without a legitimate medical purpose and outside the scope of professional practice.

15.     After the "patient" receives the prescription, the crew leader often transports them to a pharmacy to fill the prescriptions. Again, the crew leader usually supplies cash to pay for the filled prescription. Next, the crew leaders pay the patients for their time in cash or drugs, then take possession of the pills, which are then diverted to the streets for sale. Through this process, clinic owners/operators and physicians make money from the patients that are brought to the clinic—the more patients, the more money—and crew leaders make money through the diversion and sale of opioid controlled substances.

16.     This traditional "pill mill" business model is precisely how Relief operated.

<b>FACTS</b>

17.     In April 2019, DEA was notified that Relief was operating an illegal pain management clinic. Shortly thereafter, a confidential source (CS 1) visited Relief and advised investigators that Relief was charging $350 per visit for a Hydrocodone prescription.

18.     DEA was also notified by various pharmacies of suspicious prescriptions that were issued using Dr. 1's name and DEA number. (Throughout this complaint, various medical doctors and individuals are referenced by number regarding their connection to Relief, with each number referring to a different doctor or individual. The identities of each doctor or individual are known to the United States.) These doctors' prescriptions described herein all issued from the illegal pill mill operation at Relief conducted by Peterson.

19.     The Prescription Monitoring Program ("PMP") is a database to which Texas pharmacies are legally required to report all prescriptions for controlled substances that are

dispensed in Texas. According to the PMP data, from January 26, 2019, to November 13, 2020, the following prescriptions were filled after being issued by Dr. 1: 2,931 prescriptions for 334,130 dosage units of Hydrocodone products, 2,025 prescriptions for 233,778 dosage units of Oxycodone products; and 3,507 prescriptions for 305,171 dosage units of Carisoprodol.

20.     According to PMP data, from November 30, 2018, to April 28, 2020, the following prescriptions were filled after being issued by Dr. 2: 1,769 prescriptions for Oxycodone totaling 209,248 dosage units; 4,854 prescriptions for hydrocodone products totaling 572,018 dosage units; and 4,781 prescriptions for Carisoprodol totaling 427,240 dosage units. Additionally, from July 1, 2021 to December 30, 2021, Dr. 2 issued 630 prescriptions for 72,189 dosage units of Oxycodone products; 3,805 prescriptions for 438,470 dosage units of Hydrocodone products; and 3,736 prescriptions for 320,992 dosage units of Carisoprodol.

21.     According to PMP data, from January 1, 2020, through November 2, 2021, prescriptions were filled after being issued by Dr. 3 for the following: 1,009 prescriptions for 116,449 dosage units of Oxycodone products; 4,533 prescriptions for 526,474 dosage units of Hydrocodone products; and 4,399 prescriptions for 375,855 dosage units of Carisoprodol.

22.     According to PMP data, from September 28, 2021, to December 31, 2021, prescriptions were filled that after being issued by Dr. 4 for the following: 12 prescriptions for 1,317 dosage units of Oxycodone products; 886 prescriptions for 104,007 dosage units of Hydrocodone products; and 872 prescriptions for 75,598 dosage units of Carisoprodol.

23.     Prescriptions of this character, volume, and particular distribution are strongly indicative of the illegal diversion prescription drugs for illegal sale and use, as legitimate prescription practices would reflect different distributions of prescribed medications.

24.     In addition to the doctors above, Peterson also used information he obtained from Dr. 5 to generate prescriptions for Relief despite the fact that Dr. 5 was living and practicing out of state – with no medical practice in Houston. The investigation was unable to discover any communications between Peterson and Dr. 5, or any other records/files, authorizing Peterson to use Dr. 5's information to generate these prescriptions.

25.     According to PMP data, from February 2, 2021, to August 19, 2021, prescriptions were filled utilizing Dr. 5's name and DEA registration number for the following: 338 prescriptions for Oxycodone, totaling 39,660 dosage units; 3,114 prescriptions for Hydrocodone totaling 365,069 dosage units; and 3,080 prescriptions for Carisoprodol totaling 267,657 dosage units.

26.     In summary, Relief issued these prescriptions illegally, using these specific doctors (or their information) to prescribe these controlled substances for diversion to illegal street level sales.

27.     During the October 18, 2023 search at Relief, agents discovered an IRS application for an employer ID for another one of Peterson's businesses. The legal name of this business was listed as "Relief Medical Center, PLLC" and the trade name of the business was "Relief Medical Pain Clinic." The address was 2000 Crawford Street, #1530 in Houston.

28.     According to Texas SOS, the entity "Relief Medical Center, PLLC" was formed on or about August 31, 2021. The Managing Member was listed as Dr. 3. A Certificate of Amendment, which was filed on or about December 31, 2021, removed Dr. 3 as the Managing Member and added Individual 1, 5340 Weslayan Street, #273407 in Houston, which is one of Peterson's addresses.

29.     Also, during the execution of the search warrant at Relief Medical Center, investigators seized numerous prescriptions filled at Next Level Pharmacy from physicians with addresses for Relief Medical Center. The prescriptions included prescriptions dated in 2021 from Dr. 2 and prescriptions with Dr. 5's name and DEA registration number. In addition, there were prescriptions from Dr. 6. Based on these dates and the information in those prescriptions, and upon information and belief, Peterson had multiple clinics operating at the same time during 2021.

30.     During the search at Relief on October 18, 2023, investigators spoke with Relief employees. One employee (Individual 2) confirmed that Peterson was the owner of Relief, that patients got Oxy or Norco and Soma from Relief, and that patients would sometimes request certain colors of pills. Investigators also learned that a nurse practitioner would put the pharmacy information in a chart and then it would be sent either electronically or over the phone to the pharmacy using the DEA number of Dr. 8. Dr. 8 does telehealth and is located in San Antonio. Individual 2 also stated that the clinic only accepts cash (which is further indication that Relief was operating as an illegal pill mill).

31.     In a follow-up conversation, conducted by investigators a few months after the search, Individual 2 also confirmed the prescribing doctors at the 2000 Crawford location were individuals identified here as Dr. 4 and Dr. 6. Individual 2 stated that he/she never saw Dr. 6, but he/she had seen prescriptions issued by Dr. 6. Individual 2 also confirmed on October 2021, the clinic moved from 2000 Crawford to 2101 Crawford.

32.     According to the Texas Medical Board public information records, on or about July 25, 2022, the prescribing doctor for Relief Medical Center at that time, was Dr. 9. Further, the same search of public records on the Texas Medical Board website listed Individual 3 as a

nurse delegate under physician Dr. 9, beginning July 25, 2022, at 3208 Broadway Street, Houston, TX, 77017.

33.     On or about September 1, 2022, DEA DI Kimberly Gonzalez conducted an interview with Dr. 9 concerning his DEA registration number. DI Gonzalez stated that during the interview, Dr. 9 stated that he currently worked at Relief Medical Center under the management of Keilan Peterson, who he knew to be a medical director.

34.     DI Melvinla Morgan subsequently served administrative subpoenas to the Texas State Board of Pharmacy, PMP AWARXE, for records of the quantity and the type of controlled substances prescribed by Dr. 9. According to PMP data, from October 1, 2020, to November 23, 2022, the following prescriptions were filled that were previously issued by Dr. 9: 5,967 prescriptions of Hydrocodone products for 658,832 dosage units; 2,397 prescriptions of Oxycodone products for 256,666 dosage units; and 4,855 prescriptions of Carisoprodol for 361,893 dosage units. The PMP data indicated that that Hydrocodone-acetaminophen 10/325, Carisoprodol 350 mg, and Oxycodone 30 mg made up over 98% of Dr. 9's controlled substance prescribing. These particular controlled substances are commonly trafficked, and this particular distribution of prescriptions is strongly indicative of illegal pill mill practices at Relief.

35.     In or about September 2022, DEA agents and members of the Houston Police Department (HPD) Pharmaceutical Squad conducted an undercover "buy/walk" operation at Relief Medical Center, 3208 Broadway Street in Houston, during which two HPD Officers went undercover ("UC") inside the clinic posing as a crew leader and patient. One HPD officer posed as a first-time patient (UC 1) and another HPD officer posed as a crew leader (UC 2).

36.     After the buy/walk operation, the two UC HPD Officers debriefed with DEA TDS agents/task force officers and the rest of the HPD Pharmaceutical Squad. UC 1 who posed as a

"new patient" approached the receptionist desk where UC 1 was attended to by a receptionist. After the buy/walk operation, the UCs later identified the receptionist as Individual 4 by reviewing her name on the receipt of the buy/walk and comparing her image from the HPD UC's covert surveillance video that was used during the buy/walk to record the undercover operation to a Texas driver license photo query which confirmed Individual 4's identification. According to UC 1, Individual 4 told UC 1 the cost for the medical appointment was $350 cash and it had to be the exact amount only. UC 1 paid Individual 4 $350 of pre-recorded federal DEA issued cash for the medical visit. UC 1 was given new patient forms to fill out before being called to the back.

37.    According to UC 1, UC 1 was then taken to a patient room where UC 1 waited to be seen by the doctor. A short time later, a Nurse Practitioner (NP) entered the patient room and attended to UC 1. The HPD UCs later identified the NP as Individual 3 by a driver license photo. According to UC 1, Individual 3 reviewed the patient questionnaire with UC 1 and performed little to no examination on the UC before prescribing him Hydrocodone and Carisoprodol. The interaction between Individual 3 and UC 1 lasted approximately three minutes. UC 1 confirmed that UC 1 was not examined by any doctor during the buy/walk visit.

38.    During the operation, UC 1 chose to have the prescriptions sent to Mariste Pharmacy on the clinic's medical questionnaire. However, a Relief employee stated to UC 1 that they do not send prescriptions to Mariste Pharmacy, and that in order to re-route UC 1's prescription to another pharmacy, UC 1 would need to speak to the clinic's manager "Keilan." The Relief employee provided UC 1 with a phone number and stated that the number provided was the clinic's manager "Keilan" and that the UC should text "Keilan" first to get a faster

response. The HPD Pharmaceutical Squad decided at this time to terminate any further attempts in getting UC 1's prescriptions filled.

39.     DEA TDS investigators learned that Relief opened a clinic at 2101 Crawford Street, Suite 300, Houston, Texas, 77002, around October 2022. In or about the week of October 17, 2022, at the direction of DEA, a confidential source ("CS 2"), whom DEA TDS found reliable and credible, contacted Relief, and asked for an appointment with Dr. 9. CS 2 spoke with a female who identified herself with a female name. This individual, Individual 5, told CS 2 that new patients were required to go to 2101 Crawford Street, Suite 300, Houston, Texas, 77002, and after the initial appointment, follow-up visits could be conducted at 3208 Broadway Street in Houston.

40.     On or about October 20, 2022, DEA agents conducted an undercover "buy/walk" operation at Relief Medical Center, 2101 Crawford Street, Suite 300 in Houston. Prior to the operation, TDS members met with CS 2 at a neutral location and gave CS 2 instructions for the medical visit. TDS provided CS 2 with $500 in DEA Official Advanced Funds (OAF) to pay for the medical appointment. CS 2 was also provided with electronic surveillance equipment in order for TDS members to obtain audio and video recording of CS 2's visit to the clinic. Agents observed CS 2 enter the commercial building that the clinic was in. After the operation, TDS members debriefed CS 2, who related the following information.

41.     Upon arriving, CS 2 rang the Ring doorbell twice and then walked into the clinic. CS 2 stated he/she spoke with a female receptionist, who asked CS 2 for a driver's license. CS 2 was told to have a seat in the waiting room. CS 2 stated approximately 30 minutes later, the receptionist gave CS 2 a packet and requested a $300 payment for the doctor's visit. CS 2 stated within the packet of papers to fill out, CS 2 was required to write down a pharmacy name and

address to send the prescriptions to.  CS 2 stated once the paperwork was filled out and turned in

to the front desk, the receptionist told CS 2 to have a seat. CS 2 stated after waiting

approximately 30 to 45 minutes, a female employee who identified herself as Individual 5 asked

CS 2 to verify CS 2's address.

42.     A few minutes later, CS 2 was taken to the triage room by another female

employee. CS 2 stated there were three other patients in the triage room where the female

employee took vitals from CS 2 and consulted with CS 2 in front of the other patients. CS 2

stated the female employee was asking "weird" questions such as if CS 2 was employed and

where and if CS 2 was alone or did CS 2 come with anyone. CS 2 stated this employee also

corrected CS 2's paperwork that CS 2 had already filled out and was told to circle "low levels."

CS 2 was coached on how to fill out paperwork to receive prescriptions.

43.     CS 2 stated while waiting in the triage room, there was a female patient who was

taken to Room # 1. CS 2 overheard Individual 5 tell the female patient in Room # 1 that they

could not fill a prescription for her due to her having too many recent prescriptions listed in her

name on the prescription monitoring program. Shortly thereafter, CS 2 was taken to Room #3

where CS 2 waited for several minutes. CS 2 stated another female employee, with embroidered

lettering on her scrubs and credentials that read "FNP," arrived in Room #3. Through a driver's

license photo, CS 2 later identified this to be Individual 6.

44.     CS 2 stated Individual 6 asked CS 2 to stand up and walk to the front of the exam

room. CS 2 stated Individual 6 then told CS 2 that CS 2 needed to lose weight and diet. CS 2

stated Individual 6 said she would prescribe CS 2 "Norco" and "Soma." CS 2 asked Individual 6

if CS 2 could be prescribed Oxycodone for the pain. CS 2 stated Individual 6 told CS 2 she does

not prescribe Oxycodone, but if CS 2 came back with a scan in 30 days on a follow-up, she

would reconsider. CS 2 stated that Individual 6 said CS 2's PMP shows CS 2 has not been prescribed Oxycodone in a long time which was another reason Individual 6 gave for not prescribing the Oxycodone. CS 2 was told to contact Individual 5 30 days from October 20, 2022, to schedule another appointment.

45.     On or about January 11, 2023, at the direction of DEA, CS 2 contacted Relief via phone and made a medical appointment at Relief for January 17, 2023. On or about January 17, 2023, DEA TDS conducted a buy/walk operation utilizing CS 2 at Relief Medical Center, 2101 Crawford Street, Suite 300 in Houston. TDS members met with CS 2 at a neutral location and gave CS 2 instructions for the medical visit. TDS also provided CS 2 with $1,000 in DEA OAF to be utilized as payment for the medical appointment. TDS also provided CS 2 with electronic surveillance equipment to obtain audio and video recordings of the operation. CS 2 entered the building at 2101 Crawford Street that the clinic was in. TDS members debriefed with CS 2 after the operation and learned the following.

46.     Upon arriving, CS 2 entered the medical clinic and spoke with a female receptionist who was sitting behind the window. CS 2 stated the female receptionist asked for his/her identification. CS 2 stated he/she told the female receptionist he/she was there for a scheduled medical appointment. CS 2 stated he/she then asked the receptionist if Dr. 7 was working and the receptionist stated they were in the back. TDS developed information that the new prescribing doctor at Relief Medical Center, 2101 Crawford Street, Suite 300, Houston, Texas 77002 was Dr. 7.

47.     CS 2 stated the receptionist called him/her back to the window and requested payment. CS 2 stated the receptionist stated the office visit fee was $350 and the MRI fee was $70 (Total: $420). CS 2 stated to the receptionist he/she had $450 and did not have any change.

CS 2 stated the receptionist advised he/she could leave to go get exact change or she could apply the extra $30 towards the MRI fee. CS 2 paid $350 for the office visit and $100 for the MRI.

48.     CS 2 stated he/she sat down in the waiting area for approximately 20 minutes until he/she was called to the back by a male employee. CS 2 stated once in the back he/she was taken to the triage area where there was another patient sitting near him/her. The CS stated the male employee measured his/her height, weight, and blood pressure. CS 2 stated another employee, a female, was also in the triage room who began to ask him/her questions.

49.     CS 2 stated after his/her vitals were taken, he/she was placed in a patient room where he/she was alone while waiting to be examined by a doctor. CS 2 stated approximately 10 minutes later, another female employee walked into the patient room where he/she was waiting. CS 2 stated the female employee had the letters "NP" embroidered on her scrubs. CS 2 stated the female employee, who was later verified as Individual 3 by CS 2 later when shown a Texas driver's license of Individual 3. CS 2 stated Individual 3 asked him/her for name and date of birth. CS 2 stated Individual 3 asked him/her if there was no change since last visit, asked if he/she had high blood pressure and what he/she was taking for it. CS 2 inquired about the MRI exam process.

50.     CS 2 stated Individual 3 explained he/she can be put on a payment plan to pay for an MRI which is mandatory by every fifth doctor's visit. Individual 3 stated the total is $300 for the MRI which would need to be conducted at their Spring location. CS 2 stated Individual 3 said if the MRI payment is not paid in full by the fifth visit, the office will hold his/her medication until the $300 is met. CS 2 stated that Individual 3 stated the reason for the MRI is in case CS 2 needs stronger medication. CS 2 stated Individual 3 did not physically touch him/her nor was there any type of examination completed. CS 2 stated he/she never saw a doctor and the cursory

visit lasted approximately three minutes. CS 2 stated he/she requested the "Norco" prescription be sent to Crossroads RX pharmacy located at 1919 Wirt Road, Suite B, Houston, TX, 77005.

51.     On or about February 2, 2023, TDS members conducted an operation at Relief Medical Center, 2101 Crawford Street, Suite 300, Houston, TX, 77002. Under the direction of DEA, CS 2 was going to travel to Relief, pay for an MRI, and then travel to another location for the MRI. TDS members met with CS 2 prior to the visit to Relief and gave CS 2 instructions for the visit. CS 2 was given $500 in OAF in order to pay for the remaining balance of $200 towards the MRI examination. CS 2 was provided electronic surveillance equipment in order for investigators to obtain audio and video recording of CS 2 during the operation. CS 2 then traveled to Relief at 2101 Crawford Street. CS 2 was observed entering the clinic and after the visit, TDS members met with CS 2 and debriefed CS 2, who related the following information.

52.     Upon arriving to Relief, CS 2 entered the clinic and spoke with a female receptionist (Individual 7) who identified herself. CS 2 stated he/she told Individual 7 that he/she was there to pay off the balance of $200 for the MRI examination. CS 2 stated Individual 7 asked him/her for identification, looked up information in the computer, and then spoke with someone in the back before returning to CS 2. CS 2 stated Individual 7 collected $200 in OAF from CS 2 and handed him/her a receipt for the payment. CS 2 stated Individual 7 told him/her that he/she could go to the MRI place located at 2104 FM 2920, Spring, TX, 77388, for the MRI examination as a walk-in. CS 2 stated that Individual 7 did not tell CS 2 the name of the MRI business. CS 2 stated Individual 7 handed him/her a receipt for the $200 payment and a radiology order that read "Northstar Healthcare Systems Inc 2101 Crawford St., Houston, TX 77002-8942."

53.     The radiology report had a hand-written note in blue ink that read "2104 FM 2920, Spring, TX 77388." The radiology report also notated the test name as "MRI Lumbar Spine without CM" and Test Status: "Routine" under ordering physician name: "[Dr. 7]". The radiology report also reflected the report was electronically signed on January 17, 2023 by Dr. 7. The receipt CS 2 received for payment of the MRI examination read "North Star Urgent Care, 3208 Broadway St., Houston, TX, 77017."

54.     On the same date (February 2, 2023), TDS members met again with CS 2 prior to CS 2's visit to the MRI imaging business at 2104 FM 2920, Spring, TX, 77388. CS 2 was given instructions for the visit and provided with electronic surveillance equipment in order for investigators to obtain audio and video recording of CS 2's visit to the imaging center. CS 2 then traveled to 2104 FM 2920, Spring, TX, 77388.  CS 2 was observed entering the business. CS 2 later met with TDS members and was debriefed. CS 2 related the following information.

55.     Upon arriving, CS 2 entered the imaging center and spoke with a female receptionist who was sitting behind the front counter. CS 2 stated the female receptionist asked him/her what type of injury he/she had, and CS 2 stated he/she was involved in a car accident. CS 2 handed the receptionist the radiology report electronically signed by Dr. 7 and dated January 17, 2023. The female receptionist then handed CS 2 some paperwork to fill out. CS 2 stated the receptionist called the medical clinic he/she just came from (Relief Medical Center, 2101 Crawford Street., Suite 300, Houston, Texas 77002) and began to speak in Spanish. The receptionist then told CS 2 the MRI examination would be approximately 20 minutes long.

56.     CS 2 was then called to the back by a female employee. CS 2 referred to this female as the "Tech." The "Tech" then took CS 2 to a locker room and advised him/her to remove clothing and put on a gown. The "Tech" then advised CS 2 that he/she could not have

any electronics or metal on him/her and must be locked up inside the facility locker during the MRI exam. The CS changed and then locked all electronic equipment, including the covert recording devices, inside the locker. The "Tech" stated the MRI machine can mess up any electronics that go inside the examination room which was the reason why all items needed to be locked up.

57.     CS 2 was then taken to the MRI examination room where he/she laid on the MRI table while being instructed by the "Tech" not to move. The "Tech" further stated to CS 2 the machine would warm up. CS 2 stated the "Tech" took multiple "snap shots" (imaging) of his/her person and concluded the MRI imaging examination. CS 2 asked the "Tech" how did the imaging process work. The "Tech" explained to CS 2 that she was just the technologist and his/her images would be sent off to the radiologist for analysis and the radiologist would in turn send the images back to her (the "tech"), and she would send the images/analysis to the doctor which would take approximately three days. CS 2 stated there were two female employees inside the imaging center and no patients other than him/her. CS 2 then asked the "Tech" about the examination rooms and what each one did. The "Tech" explained one room was the x-ray room and the other was for MRI examinations. The "Tech" opened the doors to the x-ray room and the MRI room to show what each room looked like.

58.     According to Texas SOS, Peterson formed the business "Northstar Healthcare Systems Inc." on or about September 29, 2020. SOS records indicated there were three assumed names under which the business or professional service is or is to be conducted or rendered; these three names are "Northstar Imaging Center," "Northstar Urgent Care," and "Northstar Surgery Center." The mailing address of the business is 2104 FM 2920 Road, Spring, TX, 77388. A Certificate of Amendment was filed on or about December 31, 2021, which removed

Peterson as Director and added Individual 1. The Texas Franchise Tax Information Report for 2022, which was dated March 15, 2022, listed Peterson as the Director.

59.     According to Texas SOS, Keilan Peterson formed the business "MRI Xpress LLC" on or about November 20, 2019, and listed himself as CEO of the business. The mailing address and principal place of business is 5340 Weslayan Street, #273407, Houston, Texas, 77277.

60.     During the federal search warrant executed at Relief Medical Center, 3208 Broadway Street, Houston, TX, 77017, documents that purportedly detail MRI results for patients were seized. At least one document had "Northstar Imaging Center" in the top right corner and "Northstar Urgent Care Imaging," 2104 FM 2920, Spring, TX, 77388 in the top left corner of the document. The date of service on this document was May 23, 2022. At least one document seized reflected "Xpress MRI" at the top of the document with an address of 2104 FM 2920, Spring, TX, 77388. This document reflected a date of July 14, 2022.

61.     Relief requires an MRI for patients every five doctor's visits in order to give Relief an appearance of legitimacy while extracting more profit from Relief's "patients".

62.     Beginning on or about March 15, 2023, periodic surveillance was conducted on Relief at the Broadway Street location, which revealed the clinic was closed for business until approximately June 2023.

63.     In or about July 2023, DEA TDS conducted surveillance at the Relief location on Broadway Street and observed that the clinic appeared back open for business and the parking lot was full of vehicles and people, including crew leaders who appeared to be running several patients in and out of the clinic.

64.     In or about July 2023, at the direction of DEA, CS 2 contacted Relief via phone and made an appointment for July 19, 2023. On or about July 19, 2023, DEA TDS conducted a buy/walk operation utilizing CS 2 at the Relief location on Broadway Street.  DEA TDS met with CS 2 at a neutral location and gave CS 2 instructions for the upcoming buy/walk. DEA TDS members gave CS 2 $500 in DEA OAF to be utilized as payment for the medical appointment. DEA TDS also provided CS 2 with electronic surveillance equipment to obtain audio and video recordings of the operation. CS 2 was observed entering Relief and speaking with the front desk receptionist. The investigative team debriefed with CS 2 after the operation and learned the following.

65.     Upon entering, the receptionist requested the CS 2's identification and then told CS 2 the cost for the appointment would be $350. CS 2 paid for the appointment and the receptionist then handed the CS 2 three pages of follow-up paperwork to fill out. One of the questions on the clinic's medical questionnaire asked for a pharmacy of choice. At the DEA investigative team's direction, CS 2 wrote that he/she wanted to use Next Level Pharmacy located at 1110 Texas Parkway, Suite 200, Stafford, TX, 77477, as the place for the clinic to send his/her prescriptions. The receptionist then called CS 2 back to the front counter and asked CS 2 if he/she had permission from "Jay" to use that pharmacy to fill his/her prescription. CS 2 stated he/she did not. The receptionist told the CS in order to get prescriptions filled at Next Level Pharmacy, he/she needed permission from "Jay" first. A confidential source confirmed that Keilan Peterson is also known as "Jay." In addition, Peterson's Instagram username is "Young Jay."

66.     The receptionist then wrote "Clear Wellness 2, Dr. [8]" on a sticky note and handed it to CS 2. The receptionist then told the CS to call whatever pharmacy he/she wants to

use to fill his/her prescription and inquire if that pharmacy will accept "Dr. [8] with Clear Wellness 2."

67.     CS 2 was then called to the back by a male Nurse Practitioner (NP) who took the CS's vitals. As CS 2's vitals were taken, CS 2 asked the male NP how long Relief was back at the Broadway Street location and the NP replied one month.

68.     According to CS 2, after the CS 2's vitals were taken, the NP took CS 2 to a patient room. A few minutes later, a female NP (Individual 8) entered the patient room and identified herself to the CS. Individual 8 reviewed the CS's follow-up paperwork that CS 2 had filled out. Individual 8 asked CS 2 if the medication from the last visit was working and CS 2 stated it did. CS 2 asked Individual 8 if she could prescribe him/her Oxycodone. Individual 8 stated the clinic does prescribe Oxycodone but that she could not prescribe CS 2 Oxycodone because CS 2 has not been going to the clinic regularly. CS 2 was not physically examined and the visit with Individual lasted approximately three minutes. CS 2 was not physically examined by Dr. 8 or any other doctor.

69.     The pharmacy information CS 2 selected as their pharmacy of choice would not fill the prescription for the CS from this medical visit. At the DEA's direction, CS 2 went back to Relief Medical Center and requested to have his/her prescription rerouted to another pharmacy. The clinic receptionist charged the CS $50 to reroute his/her prescription to another pharmacy.

70.     On or about August 9, 2023, DEA TDS set up a buy/walk operation utilizing CS 2, whose prescriptions were ready at the pharmacy from his/her recent medical visit to Relief. CS 2 paid the pharmacy $650 for his/her prescriptions. The prescriptions were prescribed to the CS by Dr. 8 from the Broadway Street location and prescribed CS 1 the following medications: Hydrocodone, 10-325 mg -110 tablets, Carisoprodol 350 mg - 50 tablets, Ibuprofen - 30 tablets,

Stool Softener – 30 tablets, multi-Vitamins – 30 tablets, and a jar containing 8 ounces of Blue 2% Gel.

71.     According to the Texas Medical Board, the primary physician is required to register with the board as a pain management clinic and each clinic location requires a separate pain management clinic certificate. Dr. 8 does not have a pain management clinic license with the Texas Medical Board.

72.     According to the Texas SOS, an application for registration of a foreign limited liability company was filed under entity name Wyoming Pharmacy Holding Company, LLC, and the principal office address of the limited liability company is 5340 Weslayan Street, #273407, Houston, TX, 77005. The company was registered in Texas on February 9, 2022; the name of the governing person of Wyoming Pharmacy Holding Company, LLC, is "Keilan Peterson." According to Texas SOS, Individual 9 was the managing member of NextLevel Pharmaceuticals, LLC. Agents would later discover that Individual 9 is the mother of Peterson's child.

73.     On March 1, 2023, a Metro City Bank account was opened under the business name: NextLevel Pharmaceuticals LLC, 1110 Texas Parkway, Suite 200, Stafford, TX, 77477. The Metro City Bank records revealed that "Individual 9" was listed as the account owner and "Keilan Darnell Peterson" was an authorized signer on the bank account. On the bank application form, Keilan Peterson put his home address as 5340 Weslayan Street, # 273407, Houston, TX, 77005.

74.     According to the Texas SOS, Individual 9 became the Managing Member of "NextLevel Pharmaceuticals LLC," 1110 FM 2234, Suite 200, Stafford, TX, 77477, on or about October 15, 2021. Individual 9 replaced another individual, who had been the Managing Member since NextLevel Pharmaceuticals, LLC, was formed on or about May 29, 2020.  Texas SOS

records reflect that the assumed names of "NextLevel Pharmaceuticals LLC" are "Nextlevel Pharmaceuticals LLC," "Nextlevel Pharmacy," and "Next Level Pharmacy 2." Texas Board of Pharmacy records reflect that the name of the pharmacy is "Next Level Pharmacy." There is no "Next Level Pharmacy 2" in the Texas State Board of Pharmacy database. SOS records reflect that Peterson purportedly electronically signed Texas Franchise Tax Public Information Reports for NextLevel Pharmaceuticals, LLC, for 2021 and 2022.

75.     Furthermore, Texas State Board of Pharmacy records indicate that Pharmacist 1 is listed as the Pharmacist In Charge (PIC) of Next Level Pharmacy. From prior investigations, it is known to DEA agents that Pharmacist 1 was previously registered as a fill-in pharmacist at BRX Pharmacy, a known pill mill pharmacy. Pharmacist 1 was present at BRX Pharmacy when DEA Diversion Investigators executed a search warrant on the pharmacy for a pill mill investigation in July 2023. During the search warrant, Pharmacist 1 was interviewed. Furthermore, Pharmacist 1 signed a "Surrender for Cause" at Ready Pharmacy, which was another documented pill mill pharmacy.

76.     According to the Texas Board of Pharmacy "Red Flags" Checklist for Pharmacies, it is a red flag (and indicative of an illegal pill mill) if a pharmacy fills a discernable pattern of prescriptions for prescribers who write essentially the same prescriptions for numerous persons, indicating a lack of individual drug therapy. It is further indicative of an illegal pill mill if prescriptions presented to the pharmacy are for controlled substances with popularity as street drugs, such as opiates, benzodiazepines, muscle relaxants, psychostimulants, and/or cough syrups, or any combination of these drugs. Furthermore, it is also a common illegal pill mill practice if persons pay with cash or with credit cards more often than through insurance. All of these are true of Peterson's operations.

77.     PMP records show that between June 2021 to July 2023, Next Level Pharmacy dispensed 31,604 controlled substance prescriptions, all of which are prescriptions for Subject Drugs, and other controlled substances to include: Tramadol, Phentermine, Acetaminophen, Zolpidem, and Alprazolam. Also, during this time frame, over 45% of Next Level Pharmacy's dispensing consisted of Hydrocodone-Acetaminophen 10/325 mg, over 31% consisted of Oxycodone 30 mg, and 31.06% consisted of Carisoprodol 350 mg tablets, which were the top three drugs being dispensed at the pharmacy. Further, PMP records show that 95.28% of prescriptions dispensed were paid in cash.

78.     Below is a chart of the Subject Drugs and other drugs purchased from wholesalers by Next Level Pharmacy:

| | | | |
|---|---|---|---|
| HYDROCODONE-ACETAMIN 10-325 MG | 14283 | 137 | 38.06% |
| CARISOPRODOL 350 MG TABLET | 6656 | 102 | 28.33% |
| OXYCODONE HCL (IR) 30 MG TAB | 8596 | 86 | 23.89% |
| OXYCODONE HCL 30 MG TABLET | 1300 | 13 | 3.61% |
| TRAMADOL HCL 50 MG TABLET | 375 | 12 | 3.33% |
| PHENTERMINE 37.5 MG TABLET | 150 | 5 | 1.39% |
| OXYCODONE-ACETAMINOPHEN 10-325 | 200 | 2 | 0.56% |
| ACETAMINOPHEN-COD #4 TABLET | 12 | 1 | 0.28% |
| ZOLPIDEM TARTRATE 5 MG TABLET | 30 | 1 | 0.28% |
| ALPRAZOLAM 2 MG TABLET | 2 | 1 | 0.28% |
| **Grand Total** | **31604** | **360** | **100.00%** |

79.     PMP records also revealed that the following doctor's prescriptions were filled by Next Level Pharmacy: Dr. 7, Dr. 8, Dr. 9, Dr. 5, and Individual 6.

80.     On Monday, July 10, 2023, DEA TDS Investigators conducted surveillance at Next Level Pharmacy located at 1110 Texas Parkway, Stafford, TX, 77477, during the early and late afternoon hours. During the span of the surveillance, law enforcement personnel did not observe any customers enter or exit the location. A DEA TDS Investigator attempted to enter the

pharmacy as a customer but the entry/exit door to Next Level Pharmacy was locked. The hours

of operation posted on the door was Monday through Friday 2 p.m. to 6 p.m. On Tuesday,

August 29, 2023, DEA TDS Investigators conducted further surveillance at Next Level

Pharmacy and again the door sign stated that the pharmacy was open Monday through Friday 2

p.m. to 6 p.m. A DEA TDS Investigator attempted to enter the pharmacy as a customer, but the

door was locked, and no one was seen inside the pharmacy. The DEA TDS Investigator rang the

doorbell to the pharmacy and there was no response which indicated no one was present at the

pharmacy.

81.     However, PMP records and prescription pill bottles found in the trash at

Peterson's residence show that Next Level Pharmacy continued to dispense prescriptions through

at least August 12, 2023.

82.     On multiple occasions, DEA agents have conducted surveillance at 3926

Childress Street, Houston, TX, 77005, which is Peterson's Primary Residence. Agents/Task

Force Officers (TFOs) have observed Keilan Peterson at the residence during two trash pulls on

August 15, 2023, and September 12, 2023. Further, on September 12, 2023, Peterson was

observed exiting the residence where he grabbed the trash can from the side of the residence and

rolled it out to the curb for trash pickup.

83.     On or around August 15, 2023, DEA TFOs conducted a search of discarded trash

left on the curb of Primary Peterson Residence. The following discarded items were retrieved

from within the trash bin (some of which are pictured in the photograph below):

     a.  Miscellaneous mail addressed to "Keilan Peterson" including insurance information,

         an Edible Arrangement delivery addressed to Peterson, and a yellow sticky note of

         one of Peterson's phone numbers, several Next Level Pharmacy prescription bags,

Next Level patient receipts/leaflets, and a United Airlines boarding pass in Peterson's name.

b.  Seven empty medication prescription pill bottles containing seven different patient names each, one name per bottle. The exterior of all seven empty bottles were labeled as Oxycodone HCL 30 mg from Next Level Pharmacy and prescribed by Dr. 8.

c.  Eight empty medication prescription pill bottles containing eight different patient names, one name per bottle. The exterior of each of the eight prescription pill bottles were labeled as Hydrocodone-Acetaminophen 10-325 mg for eight different patients from Next Level Pharmacy, prescribed by Dr. 8.

d.  Five prescription medication pill bottles, each containing white oval shaped pills and a different patient name per bottle. The exterior of the prescription medication pill bottles was labeled Ibuprofen 800 mg from Next Level Pharmacy and prescribed by Dr. 8.

e.  Four medication prescription pill bottles, each containing green capsules and a different patient name per bottle. The exterior of the prescription medication bottle was labeled as Omeprazole 40 mg oral capsules from Next Level Pharmacy and prescribed by Dr. 8.

f.  Eight prescription medication pill bottles, each containing green pills and a different patient name per bottle. The exterior of the prescription medication pill bottle was labeled Esomeprazole Magnesium 40 mg oral capsule from Next Level Pharmacy prescribed by Dr. 8.

g.  One prescription medication pill bottle containing red pills with one patient name. The exterior of the prescription medication pill bottle was labeled Famotidine 40 mg oral tablet from Next Level Pharmacy prescribed by Dr. 8.

h.  One prescription medication pill bottle containing white pills and one patient name. The exterior of the prescription medication pill bottle was labeled Amlodipine Besylate 10 mg tablets from Next Level Pharmacy prescribed by Dr. 8.

i.  Eight medication prescription pill bottles, each containing green pills and a different patient name per bottle. The exterior of the prescription medication pill bottle was labeled Esomeprazole Magnesium 40 mg oral capsule from Next Level Pharmacy prescribed by Dr. 8.



*(Materials recovered in a trash pull from August 15, 2023, at Peterson's Primary Residence)*

84.     On September 12, 2023, DEA Agents/ TFOs conducted a second search of discarded trash left on the curb of the Peterson Residence. The following discarded items were retrieved from within the trash bin (some of which are pictured in the photograph below):

a.  One prescription bottle containing pills. The exterior of the prescription medication pill bottle was labeled Omeprazole, quantity: 30, from Next Level Pharmacy prescribed by Dr. 8.

b.  One prescription pill bottle containing pills. The exterior of the prescription pill bottle was labeled Ibuprofen 800 mg, quantity: 60 from Next Level Pharmacy prescribed by Dr. 8.

c.  Several paper receipts reflecting cash payments for medical visits, each receipt contained a different patient name. There were more than approximately seventy medical receipts located in the trash. Based off of PMP information, most of the patient names are patients of Dr. 8 and former patients of Dr. 7.

d.  Sticky notes containing handwritten notes and number tallies and one bank deposit slip from Frost Bank.



*(Materials recovered in a trash pull from September 12, 2023, at Peterson's Primary Residence)*

85.     Investigators conducted an open-source check and a DEA database check of the names found on the prescription pill bottles that were in the Peterson residence trash which revealed there were seventeen patients that received controlled II substances prescriptions that

were prescribed by Dr. 8 from Relief. All seventeen patients' prescriptions were from Next Level Pharmacy located at 1110 Texas Parkway, Suite 200, Stafford, TX 77477.

86.    Furthermore, during surveillance Peterson was observed carrying a black backpack from his residence to his vehicle. Peterson is known to carry large amounts of cash in his black backpack due to bank surveillance videos. These videos have shown him carrying his black backpack into Plains Capital Bank on several different dates and pulling out from the black backpack several zip lock bags containing large amounts of cash to deposit into his bank account. Below are photos taken by Agents/TFOs of Peterson at his residence carrying his black backpack and surveillance photo from Peterson's former bank, Plains Capital Bank where he deposited $51,960 of cash into his bank account.



*(Photo taken by Agents/TFOs of Peterson at his residence, carrying his black backpack)*



*(Surveillance photo from Peterson's former bank, Plains Capital Bank where he deposited $51,960 of cash into his bank account)*

87.     As mentioned previously, on October 18, 2023, court authorized federal search warrants were executed at Peterson's primary residence and Relief Medical Center, 3208 Broadway, Houston, Texas 77017. On the same date, a federal search warrant was executed at Next Level Pharmacy, 1110 Texas Parkway, Suite 200, Stafford, Texas, 77477. Investigators seized $27,349 in U.S. currency from Relief Medical Center and jewelry valued at $22,975 from Peterson's residence at 3926 Childress Street, Houston, Texas, 77005. Investigators also seized numerous receipt books from Relief Medical Center.

88.     DEA Financial Investigator (FI) Robert Kelley Johnson subsequently reviewed some of the receipt books. The receipts consisted of receipts for August 12, 2022, and receipts from August 17, 2022, to October 12, 2022. There were no receipts from August 13, 2022, to August 16, 2022. There were also no receipts for Saturdays or Sundays. There were also no receipts for October 6, 2023. The receipts totaled $591,505.  The most common receipt was in the amount of $350. There were also numerous receipts for $550. The vast majority of receipts did not note a drug on the receipt.

89.     However, there were numerous receipts in the amount of $550 that noted "Oxycodone" on the receipts. Most of these receipts had $350 in the amount box that was crossed out and $550 written close by. All of these receipts ($350 crossed out and $550 written close by) noted "Oxycodone" on the receipt. Some of these receipts also noted "medication changed." Multiple receipts appeared to be originally $350 but the "3" was changed to a "5." All of these receipts noted "Oxycodone" on the receipts. There was one receipt that reflected $350 crossed out and $500 written close by. A note on the receipt reflected "medication changed to Oxycodone."

90.     There was one receipt for $350 that indicated the patient only paid $350 because the patient had a $200 credit. There were numerous receipts that were crossed out. There were also numerous receipts where the amount was crossed out. There were multiple receipts, which totaled $3,000, that noted "credit" on the receipt.

91.     Information developed during the investigation revealed that Relief Medical Center did not accept credit cards. Based on the investigation, it is believed that the clinic did not receive payment and gave credit to an individual. The receipts that were crossed out, the amount was crossed out, or noted "credit" were not included in the total of $591,505. The receipt noted

"Oxycodone" on the receipt. One receipt reflected an apparent attempt to cross out $550. The amount of $350 was written close by. A note on the receipt reflected "norcos and somas," a reference to Hydrocodone and Carisoprodol.

92.     There were numerous receipts that reflected payments for MRIs. The total cost of the MRIs was $300, but it was usually paid in three payments. There were numerous receipts in the amount of $50 that had notes of "pharmacy fee," "re-route," or "pharmacy re-route" on the receipts. There were also multiple receipts in the amounts $100 or $200 with notes of "re-route" or "re-routes." Multiple names were on each receipt. Investigators developed information during the investigation that Relief would charge $50 to change pharmacies for the prescription. There were multiple receipts for CT scans. The receipts reflected that the cost was to be paid in multiple payments. It is believed the total cost of the CT scans was $300 based on a review of the receipts. There were multiple receipts with notes of "no call/no show fee" in the amount of $50. There were also multiple receipts with notes reflecting "release of medical records" in the amount of $50.

93.     Peterson's clinic accepted cash for payment, but there were multiple receipts that had a note of "cash app." The amounts on most of these receipts was crossed out and no amount was written in to replace it. There was only one receipt, in the amount of $350, that had a note of "cash app" where the amount was not crossed out.

94.     On February 5, 2024, DI Morgan received information from the Texas State Board of Pharmacy that Next Level Pharmacy appeared closed for business. On February 6, 2024, DI Morgan visited Next Level Pharmacy at 1110 Texas Parkway, Suite 200, Stafford, Texas ,77477, and found it to be completely empty. DI Morgan subsequently spoke to the property owner. The property owner stated that the owner of the pharmacy was "Keilan,"

referring to Peterson, and that he moved out in the middle of the night and owes her two month's rent. The property owner stated a lot of paperwork and medicine was left at the pharmacy and the property owner rented a truck to transport what was left to a dumpster.

### Financial Investigation

95.     FI Johnson reviewed records from First American Title Insurance Company regarding the purchase of the Colorado property at 30825 Washington Road, Calhan, Colorado, 80808. According to the records, Colorado Horticulture Group purchased the property on or about November 5, 2021 (which is within the period that the investigation determined that Peterson was operating the businesses described above). The sales price was listed as $165,000.

96.     Keilan Peterson was the authorized signer for, and signed the purchase documents as, the Managing Member of Colorado Horticulture Group. According to the Colorado Secretary of State, Peterson is the Registered Agent of Colorado Horticulture Group and formed Colorado Horticulture Group on or about January 9, 2020. Peterson paid a total of $164,396.78 for the property. A wire in the amount of $50,000 was sent to the title company as an earnest money deposit on September 21, 2021. The wire originated from Primeway Federal Credit Union (FCU). Another wire in the amount of $114,396.78 was sent on November 8, 2021, from Primeway FCU.

97.     FI Johnson reviewed records from Primeway FCU. The wires in the amounts of $50,000 and $164,396.78 came from Peterson's personal checking account ("act #0007"). Primeway FCU records reflect that Peterson opened act #0007 on or about April 24, 2020. On September 1, 2021, the balance in act #0007 was $213.64. There was no deposit on September 1, 2021. From September 2, 2021 to September 21, 2021, (prior to the outgoing wire of $50,000 on September 21, 2021), cash deposits into the account totaled $66,881. All of the cash deposits

were in Houston. The only non-cash deposit was in the amount of $1.00. Therefore, almost all of the $50,000 wired to the title company was funded with cash deposits.

98.     The balance in act #0007 was $112.33 on September 21, 2021, after all transactions for the day. From September 22, 2021, to November 08, 2021 (prior to the outgoing wire of $114,396.78 on November 8, 2021), the cash deposits totaled $175,649. All of the cash deposits were in Houston. The only non-cash deposits totaled $401.04. Therefore, almost all of the $114,396.78 wired to the title company was funded with cash deposits.

99.     A search through the Texas SOS's and Harris County Clerk's Office ("HCCO") databases indicate that Peterson currently owns numerous businesses. Peterson also owned businesses that were recently put in forfeiture status (SOS) or expired status (HCCO). However, to date, the investigation has not discovered a legitimate source of cash income for Peterson beyond the illegal businesses described above. Therefore, upon information and belief, these cash deposits are illegal proceeds from Peterson's illegal pill mill operation.

100.    Businesses are required to report revenue to the Texas Comptroller of Public Accounts on an annual basis. No reports were filed as required for multiple businesses owned by Peterson. Other businesses owned and/or operated by Peterson reported no revenue. According to the Texas Comptroller of Public accounts, the only businesses owned by Peterson that declared any revenue are the following:

   a.  Relief Care Group, LLC –  Reported $215,878 for 2018, $846,609 for 2019, $1,774,910 for 2020, and $2,877,739 for 2021. No report was filed for 2022.

   b.  MRI Xpress, LLC – Reported no revenue for 2019, $543,589 for 2020, and $450,212 for 2021. No report was filed for 2022.

    c.   Northstar Healthcare Systems, Inc., reported no revenue for 2020 and 2021. No report

        was filed for 2022.

    d.   NextLevel Pharmaceuticals, LLC, reported no revenue for 2020 to 2022.

    101.   In late 2023, DEA also obtained tax records for Peterson and his businesses for 2020 and 2021.  Peterson's federal tax returns for 2020 and 2021 reflect revenue from the rental property at 2104 FM 2920, Spring, TX, that housed Peterson's imaging business.

    102.   The investigation determined that cash deposits into Primeway FCU act #0007 are likely from this rental property because there were no checks or other forms of payment into these accounts that reflect rental payment. It is uncommon for rent, especially for business rental space, to be paid in cash.  In addition, surveillance was conducted at 2104 FM 2920, Spring, TX, 77388, on September 6, 2022, and multiple occasions after this date. The building contained Peterson's business and there were no other businesses in the building.

    103.   Also, as previously mentioned, CS 2 went to the MRI imaging business at 2104 FM 2920, Spring, TX, 77388, and entered the business to obtain an MRI on February 2, 2023. This was done under the direction of DEA. The CS only observed Peterson's business inside the building. It should be noted that the building where Peterson's MRI imaging business is located has "2104" clearly visible on the front of the building. According to the Harris County Appraisal District ("HCAD"), there is no record of 2104 FM 2920 in the HCAD database. According to HCAD, Peterson owned multiple units of Willow Park Office Condo at 2102 FM 2920, Spring, TX, 77388, from July 30, 2020 to June 20, 2023.

    104.   Peterson's tax returns from 2020 and 2021 show revenue from the business Colorado Horticulture Group. The gross receipts or sales for 2021 only reflects $1.00. In addition, all of the cash deposits into Primeway FCU act #0007 from September 2, 2021, to

November 8, 2021, prior to the wire of $114,396.78 to First America Title Insurance Company, were made in Houston.

105.     The other revenue declared on Peterson's tax returns for 2020 and 2021 were from Relief Care Group, LLC, and MRI Xpress (2020) and MRI Services (2021). It appears that MRI Services is a reference to MRI Xpress due to the fact DEA has not identified a business owned by Peterson in the name of MRI Services. At least one document seized during the search warrant at Relief reflected "Xpress MRI" at the top of the document with the address of 2104 FM 2920, Spring, TX, 77388. As described herein MRI imaging business operated by Peterson is operated to facilitate Peterson's illegal diversion operation. As mentioned previously, Relief Medical Center is an assumed name of Relief Care Group, LLC.

106.     In short, records from the Texas Comptroller of Public Accounts reflect the only businesses owned by Peterson that declared any revenue were businesses (Relief Care Group, LLC, and MRI Xpress, LLC) involved with the illegal diversion of controlled substances.

107.     Despite this, the investigation also determined that Peterson was also generating significant income from Next Level Pharmacy, through the illegal diversion of controlled substances.

108.     On or about January 26, 2024, investigators discovered that the real property at 30825 Washington Road, Calhan, Colorado 80808, was under contract to be sold. Investigators subsequently received the sales contract and closing statement for the seller from Stewart Title Company DBA Empire Title. The contract was signed by Peterson as Managing Member of Colorado Horticulture Group, LLC on January 16, 2024. The purchase price reflected $125,000. The closing date was listed as March 6, 2024. The closing statement indicated that the amount due to the seller was approximately $111,155.32. The United States ultimately seized the

proceeds from this sale pursuant to a seizure warrant authorized by the United States District Court for the Southern District of Texas.

109.    The financial investigation determined that the purchase of this real property was effectuated with two wire transfers in the amounts of $50,000 and $114,396.78 respectively. These transfers to First American Title Insurance Company were funded primarily with cash deposits of illegal proceeds that had been deposited into Peterson's account. Therefore, any proceeds from the sale of the property by Peterson are subject to forfeiture pursuant to 21 U.S.C. § 881(a) as proceeds of violations of 21 U.S.C. §§ 841 and 846.

110.    In addition, since the wires contained in excess of $10,000 of illegal proceeds, those transactions are violations of 18 U.S.C. § 1957, as the funds used for the transactions are proceeds of the underlying specified unlawful activities described above, rendering the total of the transactions (or property traceable to those transactions) subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A).

111.    In addition to the Colorado Property, Peterson used illegal proceeds to acquire other real properties during this time period which are also subject to forfeiture. Those funds began as illegal cash proceeds before they were deposited into Peterson's accounts and then used to purchase the additional real properties.

112.    Specifically, Peterson also purchased property at 5821 NW 127th Street, Oklahoma City, Oklahoma, 73142, on October 11, 2022. The sales price was $229,000. On October 4, 2022, earnest money in the amount of $10,000 was wired to American Eagle Title from Peterson's account (act #0010) at Colorado Credit Union. Wires of $140,000 (also from act# 0010) and $80,083.84 were also sent from Peterson on October 11, 2022 to finalize the purchase of this property.

113.    According to records from the Oklahoma County, Oklahoma Clerk's Office, Peterson signed a warranty deed that transferred the property to 5821 NW 127th Trust. The deed was notarized in Harris County, Texas on November 23, 2022, and filed in Oklahoma County, Oklahoma, on December 12, 2022.

114.    Additionally, according to records from Oklahoma Prime Title and Escrow, Keilan Peterson also purchased property at 890421 S. 3480 Road, Chandler, Oklahoma, 74834, on September 30, 2022. The Final Settlement Statement indicated that Peterson purchased the property for $100,000 and entity membership/ownership of the associated business for $400,000. The Closing Affidavit and Hold Harmless document reflected that Peterson purchased membership/ownership of CSE Properties, LLC, and Green Acre Organic Farms, Inc., from an unrelated individual. The purchase agreement indicated that the Green Acre share purchase was for $400,000 and the CSE and real property purchase was for $100,000. The purchase included assets and inventory of Green Acre Organic Farms, which included growing equipment, a 545 square foot manufacturing building with two offices and one bathroom, and facility security with a chain link fence surrounding the grow operation, security lighting, and an alarm system with CCTV cameras.

115.    The real property at 890421 S. 3480 Road, Chandler, Oklahoma, included 5.92 acres with fencing around the property, a two bedroom and two bath 980 square foot manufactured home, a 25-foot x 30-foot storage shed, and a 20-foot x 20-foot carport. The purchase also included 647 grams of medical marijuana harvested flower.

116.    Peterson paid the $100,000 in earnest money via a wire on September 14, 2022 from Colorado Credit Union act #0010. A wire of $400,000 was sent from Peterson to the title company on September 22, 2022. Among the records from Oklahoma Prime Title and Escrow

was a copy of an email from eve@reliefmedicalcenter.net to an individual with the Title

Company on September 22, 2022, which appear to indicate Peterson was attempting to pay in

cash. The email was cc'd to KD Peterson <NorthstarManagement@poton.me>. The email reads

as follows, "Hello Ms Teresa. Keilan just asked me to request that you put the deed under CSE

Properties, LLC. He understands the insurance is only for real property. He also asked if you can

then transfer the deed to a land trust. Keilan will be there Friday for close with

greenbacks…driving up. what time is close, please, so he can be there timely? and finally, Keilan

is very impressed with you…would he be able to reach out to you in the future with other

purchases to be his title person? thanks very much, Best, [name omitted] EA to Mr. Keilan

Peterson [phone number omitted].

117.    A short time later an individual with the title company sent an email to

eve@reliefmedicalcenter.net. The email reads as follows, "Great thank you. I still have some

comments/questions…CSE Properties LLC is the current owner of the real estate. If ownership is

to be in a different name I need to know the name for the deed to file at closing. Friday closing is

NOT confirmed until documents are prepared and reviewed. I will do my best. Funds need to be

a wire transfer or Cashiers Check. Did you intend to say he's bringing cash? If so, I can't accept

that. Teresa."

118.    Records from PlainsCapital Bank reflect that the remaining $400,000.00 was

wired to Oklahoma Prime Title and Escrow on September 22, 2022 and originated from

PlainsCapital Bank Total Access Checking act #7177605201 ("act #5201"). Act #5201 was

opened on or about March 11, 2022, under the name of Keilan D. Peterson, 5340 Weslayan St.,

Suite 273407, Houston, TX 77005. On September 22, 2022, prior to the outgoing wire of

$400,000, there was a cash deposit of $398,100 in Houston. The balance prior to the deposit of

$398,100 was $3,642.56. Upon information and belief, this cash deposit consisted of illegal proceeds from Peterson's illegal pill mill operation.

119.    In short, the financial investigation determined that the substantial majority of these funds used to purchase the real properties consisted of illegal cash proceeds which had been deposited into Peterson's accounts, rendering the real properties subject to forfeiture under 21 U.S.C. § 881 as illegal drug proceeds. Additionally, as each wire in excess of $10,000 contained more than $10,000 in illegal proceeds, the real properties purchased by those wires are subject to forfeiture pursuant to 18 U.S.C. § 981 as property "involved in" violations of 18 U.S.C. § 1957.

## Conclusion

Because Peterson was operating an illegal pill mill pharmacy which generated cash proceeds that either comprise a Defendant Property, or were used to acquire a Defendant Property, all of the Defendant Properties are subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a) as proceeds of controlled substance violations, namely 21 U.S.C. §§ 841 and 846. Additionally, the Defendant Properties are also subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) as property involved in money laundering, specifically violations of 18 U.S.C. § 1957.

## NOTICE TO ANY POTENTIAL CLAIMANT

YOU ARE HEREBY NOTIFIED if you assert an interest in the Defendant Properties subject to forfeiture and want to contest the forfeiture, you must file a verified claim which fulfills the requirements set forth in Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions.  The verified claim must be filed no later than thirty-five (35) days from the date this complaint was sent to you in accordance with Rule G(4)(b); or, if this Complaint

was not sent to you, no later than 60 days after the first day of publication of notice on an official internet government forfeiture site, in accordance with Rule G(5)(a)(ii)(B).

An answer or a motion under Federal Rule of Civil Procedure 12 must be filed no later than twenty-one (21) days after filing the claim. The claim and answer must be filed with the United States District Clerk for the Southern District of Texas, either electronically or at the United States Courthouse, 515 Rusk Avenue, Houston, Texas 77002. A copy must be served upon the undersigned Assistant United States Attorney either electronically or at the address provided in this Complaint.

<u>RELIEF REQUESTED</u>

The United States will serve notice, along with a copy of the Complaint, on the property owner and on any other persons who reasonably appear to be potential claimants. The United States seeks a final judgment forfeiting the Defendant Properties to the United States and any other relief to which the United States may be entitled.

Respectfully submitted,

ALAMDAR S. HAMDANI
United States Attorney
Southern District of Texas

By:        */s/ Brandon Fyffe*
Brandon Fyffe
SDTX Federal No. 3698129
Assistant United States Attorney
1000 Louisiana, Suite 2300
Houston, Texas 77002
Telephone (713) 567-9351
Brandon.Fyffe@usdoj.gov

<u>VERIFICATION</u>

I, Monica G. Andrade, a Task Force Officer assigned to the Drug Enforcement Administration, declare under the penalty of perjury, as provided by 28 U.S.C. § 1746, that I have read the foregoing Verified Complaint for Civil Forfeiture In Rem and Notice to Potential Claimants, and that the facts stated herein are based upon my personal knowledge, upon information obtained from other law enforcement personnel, or upon information I obtained in the course of my investigation, and they are true and correct to the best of my knowledge and belief.

Executed on the 30th day of April, 2024.

Monica G. Andrade
U. S. Drug Enforcement Administration